UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALEXIS TOVAR, individually and as next friend of D.P., a minor, and PHILLIP REYES as next friend of A.R. and J.R., minors, | § § § § | |
| Plaintiffs, | § § | SA-23-CV-847-FB (HJB) |
| v. | § § | |
| THE CITY OF SAN ANTONIO, TEXAS, ALFRED FLORES, and ELEAZAR ALEJANDRO, | § § § § | |
| Defendants. | § § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns two dipositive motions filed by Defendants in this case: the Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket Entry 57), filed by the City of San Antonio, Texas ("the City"); and the Second 12(b)(6) Motion to Dismiss Plaintiffs' Third Amended Complaint (Docket Entry 61), filed by Defendants Alfred Flores and Eleazar Alejandro (the "Officer Defendants").[1] Pretrial matters have been referred to the undersigned for consideration. (*See* Docket Entry 20.) For the reasons set forth below, I recommend that Defendants' motions (Docket Entries 57 and 61) be **GRANTED**.

---

[1] In earlier proceedings, Plaintiffs used the term "Officer Defendants" to include a third officer, Nathaniel Villalobos. (Docket Entry 2, at 2, 29–30; Docket Entry 32, at 3, 29–30.) However, the District Court dismissed Plaintiffs' claims against Officer Villalobos (*see* Docket Entry 52, at 2–3), and Plaintiffs have not asserted a claim against him in their live complaint (*see* Docket Entry 65, at 1 n.1 (indicating that Plaintiffs have "amended [Villalobos] out of the Third Amended Complaint")).

## I.    Jurisdiction.

Plaintiffs assert claims under 42 U.S.C. § 1983.  The Court has original jurisdiction over these § 1983 claims pursuant to 28 U.S.C. § 1331.  The undersigned issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.    Applicable Legal Standard.

The Court must dismiss a complaint when it fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  "Dismissal can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Sims v. Allstate Fire & Cas. Ins. Co.*, 746 F. Supp. 3d 417, 420 (W.D. Tex. 2024).  To survive dismissal, the complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when the well-pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In determining whether to grant a motion to dismiss, the district court must not go outside the pleadings." *Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, 452 F. Supp. 3d 589, 596 (S.D. Tex. 2020) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).  Accordingly, the Court's inquiry "is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).  However, the Court may also consider documents attached to a defendant's motion to dismiss when they "are referenced in the complaint and are central to the plaintiff's claims." *Id.*; *see Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ("Documents . . . attache[d] to a motion to dismiss are . . . part of the pleadings if they are referred to in the plaintiff's complaint and are

central to her claim."). Accordingly, when a § 1983 complaint refers to body-worn camera ("BWC") footage depicting the events at issue, as is the case here (*see* Docket Entry 56, at 8), "caselaw supports [the Court's] consideration of the video." *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (citations omitted).[2]

In ruling on a 12(b)(6) motion to dismiss, "the Court assumes the truth of 'well-pleaded factual allegations' and 'reasonable inference[s]' therefrom." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024) (quoting *Iqbal*, 556 U.S. at 678–79). However, the Court does not assume the truth of "legal conclusions; mere labels; [t]hreadbare recitals of the elements of a cause of action; conclusory statements; [or] naked assertions devoid of further factual enhancement." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc) (quoting *Iqbal*, 556 U.S. at 678) (internal marks omitted); *see Damond v. City of Rayville*, 127 F.4th 935, 938 (5th Cir. 2025) ("[C]onclusory allegations or legal conclusions masquerading as fact[s] . . . will not suffice to prevent a motion to dismiss."). Moreover, where relevant events are captured on video, as they are here, "the video depictions of [the] events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video blatantly contradict[s] those allegations." *Winder*, 118 F.4th at 643 (citations and quotation marks omitted); *see Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014) ("[The Court] will not adopt a plaintiff's characterization of the facts where unaltered video evidence contradicts that account.").

---

[2] In their response to the Officer Defendants' motion, Plaintiffs also confirm that they "do not object to the Court['s] considering the BWC footage when evaluating the merits of th[e] motion," and aver that the motion "should be decided on the record [at hand], including the BWC footage." (Docket Entry 65, at 3 and n.2.)

**III.    Factual Background.**

The facts of this case are indisputably tragic: police officers shot and killed a woman in her apartment, while she was in the midst of a severe psychological crisis.  The undersigned presents the factual background in detail below to assist the Court in determining whether the facts, construed in Plaintiffs' favor, can overcome Defendant's motions to dismiss.[3]

In the late hours of June 22, 2023, Melissa Perez was suffering a schizophrenic episode. (Docket Entry 56, at 3.)  She was home at the time—at the Rosemont at Miller's Pond Apartments, in San Antonio, Texas.  (*Id.*)  In the throes of that episode, Perez was cutting the wires to fire alarms at the apartment complex, believing the FBI was using them to spy on her.  (*Id.*)  The San Antonio Fire Department ("SAFD") responded to a call about Perez, and made contact with her in the parking lot of the complex.  (*Id.*)  Perez identified herself and explained why she was destroying the fire alarms.  (*Id.* at 3.)  SAFD reported the incident to the San Antonio Police Department ("SAPD").  (*Id.*)

SAPD officers arrived at the apartment complex on June 23, 2023, at around 12:27 A.M., and made contact with Perez in the parking lot.  (Docket Entry 56, at 3.)  She again identified herself and explained the reasons for her actions.  (*Id.*)  At some point during the encounter, Perez began to move toward her apartment.  (*Id.*)  When one of the officers ordered her to stay put, she made a run for it.  (*Id.*)  She fled into her apartment and locked the door behind her.  (*Id.*)  After she refused the officers' orders to come out, the officers called for backup.  (*Id.*)

---

[3] The undersigned recounted the facts of the case in a previous Report and Recommendation. (*See* Docket Entry 34.) However, in light of the parties' reliance on BWC footage in the amended complaint and motion to dismiss, the undersigned presents the facts in considerably more detail in the instant Report and Recommendation.

At around 1:40 A.M., at least eight additional SAPD officers arrived at Perez's apartment. (Docket Entry 56, at 4.)  One group of officers remained at the front door; the rest positioned themselves by the rear patio.  (*Id.*)  One of the officers from the latter group climbed over the patio railing and removed the screen from the open patio window.  (*Id.*)  Ingress could not be made through the open window, however, as it was substantially blocked by a large television.  (*Id.*; *see, e.g.*, Docket Entry 61-2, at 16:54–17:30.)  When the officer removed the screen, and began reaching into the apartment, Perez threw a glass candle at him.  (Docket Entry 56, at 5.)

From this point on, the relevant events are captured on the Officer Defendants' BWCs.  At 1:48:24 A.M., upon arriving at Perez's apartment complex, Sergeant Flores made contact with the officer who removed the window screen; he explained that Perez had rushed him with a hammer and then threw the glass candle and hit him in the arm after he drew his firearm.  (Docket Entry 61-2, at 10:37–11:10.)  The candle had landed on the concrete patio floor and shattered into several visible pieces.  (Docket Entry 61-5, at 10:28–10:40.)[4]

On several occasions throughout the encounter, officers fruitlessly attempted to gain control over the situation by reasoning with Perez.  At 1:47:50 A.M., for instance, Officer Villalobos walked up to the patio railing[5] and asked Perez to come outside and talk to him, but she refused.  (Docket Entry 61-5, at 9:20–10:30.)  And at 1:50:32 A.M., Sergeant Flores walked up to the patio railing, identified himself to Perez, and asked her whether she was "going to make things more difficult" or whether she was "going to come out for [the officers]."  (Docket Entry 61-2, at 12:45–58)  Perez repeatedly interrupted Sergeant Flores to ask whether he had a warrant, to which he

---

[4] Later during the encounter, Perez admitted to throwing a candle at the officer, "after he came over without a warrant."  (Docket Entry 61-3, at 18:59–19:06; Docket Entry 61-5, at 15:18–26.)

[5] The patio railing was chest-high and could be neither stepped over nor jumped over.  (*See, e.g.*, Docket Entry 61-2, at 23:50–24:20.)

responded, "no, we don't, but we don't need a warrant; you assaulted one of my officers so we have every right to be in there." (*Id.* at 13:02–08.) About five minutes later, Officer Villalobos again attempted to reason with Perez from behind the patio railing, but to no avail. (Docket Entry 61-5, at 17:25–45.) During this exchange, Perez protested that if she came outside, or let the officers into her apartment, then she would be arrested. (*Id.*) Finally, at 1:59:03 A.M., Officer Villalobos tried one last time to reason with Perez, asking her to "please just come out so we won't have to use force or anything like that," but Perez refused because, in her words, "previously I've been arrested on false accusations—I'm not having it anymore." (Docket Entry 61-3, at 24:15–34; Docket Entry 61-5, at 20:32–52.) Perez later made herself even clearer: "you want me to come out so you can arrest me. . . . [but] I'm not going that way." (Docket Entry 61-3, at 25:00–12; Docket Entry 61-5, at 21:20–32.)

At 1:51:20 A.M., Officer Villalobos climbed over the patio railing while Perez was in another room, leaned through the open patio window into Perez's apartment, and unlocked the deadbolt lock on the patio door. (Docket Entry 61-5, at 12:48–13:24.) As Officer Villalobos withdrew his upper body from the apartment, Perez shouted "hey" and ran toward him. (*Id.* at 13:23–26.) Officer Villalobos took cover between the door and the window, unable to see Perez, and unholstered his firearm. (*Id.* at 13:24–28.) The other officers, observing from outside the patio, warned Officer Villalobos that Perez had a hammer in her hand and that she almost hit him. (*Id.* at 13:28–34.) Perez then walked away from the window and door farther into the interior of the apartment, and Officer Villalobos climbed back over the patio railing and rejoined the other officers. (Docket Entry 61-3, at 17:30–42; Docket Entry 61-5, at 13:57–14:02.)

At about the same time, one of the officers informed Sergeant Flores that there was another person in the apartment with Perez, describing him as a "bedridden . . . old man." (Docket Entry

61-2, at 13:35–42.)  When Officers Alejandro and Villalobos learned about the bedridden man in the apartment with Perez, Officer Alejandro exclaimed: "Oh shit, we have to make entry."  (Docket Entry 61-3, at 19:26–36; Docket Entry 61-5, at 15:45–54.)  Sergeant Flores ordered the officers standing by the patio to back away and give Perez some space, and ordered them to retrieve a tactical shield from their vehicles if they had one.  (Docket Entry 61-2, at 14:30–45; Docket Entry 61-3, at 17:27–32.)  Sergeant Flores also inquired whether any of the officers on scene had "less lethal" weapons on their person or in their vehicles, to which one officer responded that Sergeant Ibarra had a non-lethal bean bag shotgun.  (Docket Entry 61-2, at 16:34–50; Docket Entry 61-3, at 19:35–46; Docket Entry 61-5, at 15:55–16:05.)

After Officer Villalobos managed to unlock the patio door, he warned his fellow officers, including Sergeant Flores and Officer Alejandro, "[Perez] is ready to fight; she came right at me." (Docket Entry 61-5, at 16:23–26; Docket Entry 61-3, at 20:05–08.)  Sergeant Flores told Officers Alejandro and Villalobos to "wait for Sergeant Ibarra to get his less lethal [weapon], [and then] we'll go in there with shields, . . . [but] if she has that hammer and starts— [then] we'll do what we have to do; . . . but hopefully we can get Sergeant Ibarra to use his less lethal bean bags if he has it."  (Docket Entry 61-2, at 17:12–30; Docket Entry 61-3, at 20:08–26; Docket Entry 61-5, at 16:27–45.)  Sergeant Flores also asked an individual in charge of maintenance to retrieve a key to Perez's apartment so some of the officers could enter through the front door while others entered through the patio and elsewhere.  (Docket Entry 61-2, at 17:52–18:30.)

A few minutes later, another officer on scene volunteered to draw Perez away from the patio and back toward her bedroom, thereby allowing the other officers to enter the apartment through the patio and front door, and then hopefully to secure Perez using the tactical shield, tasers, and the bean-bag shotgun.  (Docket Entry 61-2, at 18:42–19:28.)  Although Sergeant Flores

originally approved of the plan, another officer reminded him that the room into which they were proposing to draw Perez was the same room where the bedridden old man was located. (*Id.* at 19:50–57.)

Moments later, Officer Villalobos told Sergeant Flores that Perez was no longer holding the hammer—that it was on the couch "a good bit away from her"—and Villalobos volunteered to climb the railing, try to talk to her at the patio door, and then enter quickly and grab Perez before she could retrieve the hammer. (Docket Entry 61-2, at 20:00–20; Docket Entry 61-5, at 19:12–40.) Sergeant Flores asked Officer Villalobos whether he was sure the patio door was open; Villalobos confidently responded: "I unlocked it; I was able to reach in and I was able to unlock it." (Docket Entry 61-2, at 20:20–34.) Sergeant Ibarra then arrived with the bean-bag shotgun, at which point Sergeant Flores advised him that the plan was to enter through the unlocked patio door and grab Perez before she could retrieve the hammer. (Docket Entry 61-2, at 20:56–21:10.)

At 2:01:10 A.M., Sergeant Flores advised Officer Villalobos that the two of them would enter the apartment through the patio door, as Officer Villalobos had previously suggested. (Docket Entry 61-2, at 23:21–55; Docket Entry 61-5, at 22:37–23:02.) Flores instructed another officer to go to the window of the back bedroom, where the bedridden old man was located. (Docket Entry 61-2, at 23:35–40.) And Sergeant Flores told Officer Alejandro to keep Perez engaged while he and Officer Villalobos climbed over the railing to reach the patio door. (Docket Entry 61-2, at 24:02–06; Docket Entry 61-3, at 26:57–27:04; Docket Entry 61-5, at 23:15–22.)

At 2:01:55 A.M., Officer Villalobos began climbing the railing, followed shortly thereafter by Sergent Flores. (Docket Entry 61-2, at 24:08–24:18; Docket Entry 61-5, at 23:23–32.) Upon entering the patio area, Officer Villalobos drew his taser and attempted to open the patio door, but it did not budge. (Docket Entry 61-3, at 27:12–15; Docket Entry 61-5, at 23:30–34.) While

Sergent Flores was still climbing over the railing and Officer Villalobos was trying to open the patio door, Perez retrieved the hammer and charged toward the door with it in her hand[6] while shouting "hey," at which point Officer Alejandro—from the other side of the railing—drew his weapon, shouted "watch out V," and discharged five rounds in Perez's direction, missing her each time. (Docket Entry 61-2, at 24:18–22; Docket Entry 61-3, at 27:14–18; Docket Entry 61-5, at 23:34–36.)

Sergent Flores then quickly positioned himself directly in front of the patio door, while Officer Villalobos continued to try to open the door from just on the left side of it. (Docket Entry 61-2, at 24:22–26; Docket Entry 61-5, at 23:36–40.) Less than five seconds later, with the hammer raised, Perez again charged toward Sergeant Flores and Officer Villalobos at the patio door. (Docket Entry 61-2, at 24:24–28.) Sergeant Flores fired three rounds at Perez through the glass-paneled patio door. (Docket Entry 61-2, at 24:23–28; Docket Entry 61-5, at 23:41–43.) At the same time, Officer Alejandro also fired three rounds at Perez from his position on the other side of the patio railing. (Docket Entry 61-3, at 27:22–24; Docket Entry 61-5, at 23:41–43.) The shots were fired at approximately 2:02:13 A.M. (Docket Entry 61-2, at 24:26–28; Docket Entry 61-3, at 27:22–24; Docket Entry 61-5, at 23:40–42.) Seconds later, Officer Villalobos fired five rounds into the section of wall separating the door from the open window. (Docket Entry 61-2, at 24:28–31; Docket Entry 61-5, at 23:43–45.)

Officer Villalobos then kicked the patio door until some of the shattered glass fell away, at which point he was able to reach through one of the open panels and unlock the door. (Docket

---

[6] While it is unclear from the video, Plaintiffs concede in their Third Amended Complaint that Perez was already armed with the hammer during this first charge. (Docket Entry 56, at 5.)

Entry 61-2, at 24:32–46; Docket Entry 61-3, at 27:28–42; Docket Entry 61-5, at 23:47–24:01.)[7]

Other officers then entered the apartment from the back bedroom window, where the bedridden

old man was located. (Docket Entry 61-2, at 24:42–45; Docket Entry 61-5, at 23:58–24:00.) None

of the shots fired by Officer Villalobos struck Perez. (Docket Entry 56, at 7; Docket Entry 65, at

1 n.1.) Bullets fired by Sergeant Flores and Officer Alejandro, however, did strike Perez and she

died at the scene. (Docket Entry 56, at 7.)[8] All three officers were fired from the SAPD; the

Officer Defendants were indicted for murder among other charges, while Officer Villalobos was

indicted for aggravated assault.[9] State criminal proceedings are ongoing.[10]

## IV. Discussion.

In their two-count complaint, Plaintiffs assert a § 1983 claim against the Officer Defendants

on the grounds that shooting Perez constituted excessive force in violation of the Fourth

Amendment, and a claim against the City under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436

U.S. 658 (1978), on the grounds that its policies and customs were the moving force behind Perez's

death. (Docket Entry 56, at 15, 34–37.) The Officer Defendants seek dismissal based on qualified

---

[7] Sergent Flores later asked Officer Villalobos why the door would not open, to which he responded that "there w[ere] three locks on it; so the one I had originally unlocked, there was one above that one too." (Docket Entry 61-2, at 33:11–26; Docket Entry 61-5, at 32:28–37.)

[8] From the video footage of the medical assistance Perez received immediately after the officers made entry into her apartment, it appears that she was hit by two bullets—one from each of the Officer Defendants—which struck her in the armpit and upper back. (Docket Entry 61-5, at 27:20–37.)

[9] *See* Paul Flahive, *Two Former San Antonio Police Officers Indicted for Murder of Melissa Perez*, TEXAS PUBLIC RADIO (Dec. 14, 2023, 6:05 P.M.) https://perma.cc/2A7T-PXCE. *See* FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction.")

[10] *See* Josh Peck, *Defense Attorneys Claim DA Withheld Critical Information in Trial Over Melissa Perez Shooting*, TEXAS PUBLIC RADIO (Apr. 1, 2025, 5:51 P.M.) https://perma.cc/3KKV-VKJD.

immunity (Docket Entry 61, at 14–23), which shifts the burden to plaintiff "to demonstrate the inapplicability of the defense." *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017). Because "qualified immunity is an *immunity from suit*, not merely a defense to liability," *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (emphasis in original), a defendant's request for qualified immunity should be considered at the "earliest possible stage of litigation." *Bakutis v. Dean*, 129 F.4th 299, 307 (5th Cir. 2025).

To survive a motion to dismiss based on qualified immunity, the plaintiff must "have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1163 (5th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). And just as a plausibly-pleaded constitutional violation is essential to overcome qualified immunity, it is likewise essential to Plaintiffs' *Monell* claim against the City. *See Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) ("[E]very *Monell* claim requires un underlying constitutional violation.") (citations and internal marks omitted). Accordingly, this Report and Recommendation first considers whether, in light of the well-pleaded facts and the videos, Plaintiffs have plausibly alleged a Fourth Amendment excessive-force violation. *Cf. Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (explaining that it is often "the better approach . . . to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all").[11] It then turns to the other issues presented by Defendants' motions.

---

[11] In the previous Report and Recommendation, the undersigned found—based on pleadings that did not include the BWC footage now before the Court—that Plaintiffs had plausibly alleged a constitutional violation but that the Officer Defendants were nevertheless entitled to qualified immunity because the law at the time did not clearly establish that shooting Perez under the circumstances described in the pleadings was an excessive use of force. (Docket Entry 34, at 15–16.) In light of the amended complaint—which now includes the BWC footage

## A.        *Whether Plaintiffs Have Plausibly Alleged a Fourth Amendment Violation.*

"The Fourth Amendment's right to be free from unreasonable seizures governs excessive-force claims." *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021). "[A]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Winder*, 118 F.4th at 638 (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). Whether an officer's belief to that effect was reasonable is "measured in objective terms," based on the "totality of the circumstances . . . . as then known to the officer." *Barnes v. Felix*, No. 23-1239, 2025 WL 1401083, at *4 (U.S. May 15, 2025). Thus, the Court considers the "severity of the crime[s] committed by the suspect, any prior actions taken by the officers, "such as giving warnings or otherwise trying to control the encounter;" the suspect's own conduct "is always relevant because it indicates the nature and level of the threat [s]he poses, either to the officer or to others." *Id.* "Of course, the situation at the precise time of the shooting will often be what matters most," but "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* The use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allowances must be made for the fact that officers "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Harmon*, 16 F.4th at 1163 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). Pursuant

---

depicting the relevant events and context—the undersigned finds it appropriate to engage in the constitutional analysis anew.

to the legal standards set out above, the question before the Court is whether Plaintiffs have plausibly alleged that the Officer Defendants' use of deadly force was excessive.[12]

Even when in response to a suspect without a firearm, deadly force may not be excessive if the suspect charges toward officers or others with a dangerous weapon in close proximity. *See e.g.*, *Rockwell v. Brown*, 664 F.3d 985, 991–92 (5th Cir. 2011) (defendant "charged out of his room with a deadly weapon in each hand in the direction of the officers."), *overruled in part by Barnes*, 2025 WL 1401083, at *3–*4. And when armed, a suspect need not necessarily move toward officers before deadly force may be used. *See, e.g.*, *Mace v. City of Palestine*, 333 F.3d 621, 624–25 (5th Cir. 2003) (holding that deadly force was not excessive where officer shot "intoxicated, violent[,] and uncooperative individual who was wielding a sword within eight to ten feet of several officers in a relatively confined space, . . . [after he] rais[ed] his sword").

As presented in the amended complaint, and as revealed by the BWC footage, Perez was both armed and moving aggressively towards the officers at the time of the shooting. This case thus presents facts which are in many ways analogous to *Mace* and *Rockwell*. In *Mace*, the suspect was "intoxicated, agitated, breaking windows, shouting, and brandishing a[] . . . sword." 333 F.3d at 624. Perez may not have been intoxicated and may not have broken a window, but she was certainly agitated, mentally unstable, shouting, and brandishing a hammer. In *Rockwell*, officers shot a suspect who "was armed" with two knives, "suffered from mental-health problems, had previously exhibited violent behavior," and was "running toward them." 664 F.3d at 992. Perez similarly was armed, suffering a schizophrenic episode, had already acted violently toward the officers, and was sprinting toward Sergeant Flores and Officer Villalobos when she was shot.

___

[12] Because Plaintiffs allege that the Officer Defendants "worked in concert with each other" (*see* Docket Entry 56, at 35), the Court "need not separately address the qualified immunity analysis for each officer." *Amador*, 961 F.3d at 727 n.5 (citation omitted).

In neither *Mace* nor *Rockwell*, however, was the suspect shot through any sort of barrier. Thus, the question the Court must confront is whether the glass-paneled door makes any difference. As *Barnes* teaches, the question must be answered by review not merely of the situation at the moment of the threat, but of the totality of the circumstances then known to the officers. 2025 WL 1401083, at *4. Considering the totality of the circumstances, the fact that there was a glass-paneled door between Perez and the Defendant Officers does not change the Fourth Amendment analysis.

Reasonable officers in the shoes of the Officer Defendants would have believed that Perez was charging at them through an unlocked door[13]; absent deadly force, they could not have kept Perez out of the enclosed patio area except by holding onto the doorknob and trying to keep the door shut, which would have exposed them to hammer strikes by Perez through the glass panels. It was also reasonable to believe that retreat was not an alternative, because the officers might not have been able to extricate themselves safely from the "relatively confined space" of the patio without being exposed to hammer attacks from behind by a charging Perez. *See Mace*, 333 F.3d at 625. Indeed, the video footage demonstrates that, because the patio railing was high, climbing over it was cumbersome and required both hands. (Docket Entry 61-2, at 23:50–24:20.) *Compare Mace*, 333 F.3d at 624 (emphasizing that shooting was justified by "the close quarters of a mobile home park, which limited the officers' ability to retreat") *with Amador v. Vasquez*, 961 F.3d 721, 726 (5th Cir. 2020) (emphasizing that shooting was not justified where suspect "did not advance toward the officers," and there was "nothing behind the officers hindering their ability to retreat

---

[13] It is unclear when Officer Villalobos—who was the only officer to actually grasp the doorknob and attempt to open it—became aware that the glass-paneled patio door was still locked. But this does not affect the Officer Defendant's reasonable belief; when Perez charged toward the door with her hammer for the second time, they still reasonably believed that the door was unlocked, as Officer Villalobos had previously told them.

backwards").  Given all these circumstances, the presence of a glass door between Perez and the Officer Defendants does not make the use of deadly force excessive.

The Fifth Circuit's recent decision in *Bakutis* provides indirect guidance in this regard.  In that case, police were investigating a home in the early morning hours because a concerned neighbor had reported that its front door was open.  129 F.4th at 302.  While the officers were circling the curtilage of the house, the resident, apparently realizing that someone was outside, stood up and walked to the window to investigate.  *Id.*  When she appeared by the window, an officer pulled out his gun and, without identifying himself, ordered her to put up her hands and shot her through the window before she had a chance to comply.  *Id.*  The Fifth Circuit affirmed denial of qualified immunity at the motion-to-dismiss stage, finding that there was no allegation that the resident "was violent or aggressive," and also that, at that stage of the proceedings, it was "unknown . . . whether [she] was holding a weapon."  *Id.* at 307.  In this case, by contrast, Perez had already been violent and aggressive towards the officers, and the video makes clear she was coming towards them with a weapon—a hammer—in her raised hand.[14]  Given these circumstances, *Bakutis* is distinguishable on its facts, and the Officer Defendants are entitled to qualified immunity.

Plaintiffs insist that the Officer Defendants' assessment of the threat presented by Perez was not reasonable.  (Docket Entry 65, at 8.)  There is some force to Plaintiff's argument, at least with 20/20 hindsight; courts, however, "must be cautious about second-guessing [the] police

---

[14] In *Bakutis*, neither the district court nor the Fifth Circuit could directly observe the events through video footage; their analysis was limited to the allegations in the plaintiff's complaint. *See* 139 F.4th at 302 n.2 ("Without discovery, it is unclear whether [the decedent] had a gun or other weapon in her hand when she went to the window[;] [t]he complaint does not allege that [she] did, or did not, have a weapon; . . . [but] it does allege that no weapon was pointed at the officers."). Here, by contrast, the facts were captured on video and incorporated into the pleadings.

officer's assessment of the threat level." *Harmon*, 16 F.4th at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)) (internal marks omitted).  Even viewing the video footage "in the peace of a judge's chambers," *Bailey v. Ramos*, 125 F.4th 667, 680 (5th Cir. 2025), the undersigned cannot second-guess the Officer Defendants' assessment that Perez posed a threat of serious harm to Sergeant Flores and Officer Villalobos as she charged forward with the hammer.  And their assessment must be viewed in light of the prior events that morning, including Perez's earlier attempts to assault Officer Villalobos and another officer with the hammer, and her attack on the other officer with a glass candle.  *See Barnes*, 2025 WL 1401083, at *5 ("[P]rior events . . . inform the perspective of the reasonable officer.").  Given the tense, uncertain situation facing the Officer Defendants, the Court should not deem their split-second decision to shoot an unreasonable use of deadly force, despite its tragic consequences.[15]  Accordingly, the Court should find no constitutional violation by the Defendant Officers in this case.

**B.** ***Whether Plaintiffs Can Overcome the "Clearly Established" Prong of the Defendant Officers' Qualified Immunity Defense.***

Even if the Court finds that the complaint and videos support a plausible constitutional violation, the facts alleged by Plaintiffs' case still fail to overcome the "clearly established" prong of the qualified immunity defense.  To overcome this prong, Plaintiffs must "identify a case in which an officer acting under similar circumstances was held to have violated the Constitution, and explain why the case clearly proscribed the conduct of that individual officer." *Cope*, 3 F.4th

---

[15] On the other hand, Officer Villalobos may have acted unreasonably when he fired five rounds through the section of wall separating the patio door and window two seconds after the Officer Defendants had already fired at Perez. (Docket Entry 61-2, at 24:28–31; Docket Entry 61-5, at 23:43–45.) By all indications, the threat had already been neutralized, and Officer Villalobos could not even see Perez when he opened fire. However, as none of the shots he fired made contact with Perez—and because Plaintiffs have abandoned their claims against him—the Court need not consider the reasonableness of Officer Villalobos's conduct.

at 205 (citation omitted). What matters is "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). This is essential because it can be "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," *Kisela v. Hughes*, 584 U.S. 100, 104 (2018), especially in excessive force cases, where officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Winder*, 118 F.4th at 646. The Fifth Circuit has explained that "the law must be so clearly established that . . . in the blink of an eye . . . every reasonable officer would know it immediately." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019).

Plaintiffs propose three rules that they purport are clearly established by binding case law and directly controlling here. First they propose the rule that a police officer may not shoot a suspect who is "functionally unarmed." (Docket Entry 65, at 13.) Plaintiffs cite three cases to support this rule; none of those cases, however, present facts similar to those before the Court. *See Roque*, 993 F.3d at 330, 333, and 335 (holding that officer violated Fourth Amendment by shooting "unarmed, incapacitated suspect who [wa]s moving away from everyone else present at the scene"); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 273–74, 278 (5th Cir. 2015) (holding that officer was entitled to qualified immunity after shooting armed suspect five times, but was not entitled to immunity for sixth and seventh shots, which were fired after suspect was "clearly incapacitated" on the ground); *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 417–18 (5th Cir. 2009) (holding that officer was not entitled to immunity after shooting passenger in suspect's vehicle as it drove away from him). In this case, Perez cannot be described as "functionally unarmed"; she was running toward Sergeant Flores and Officer Villalobos with a hammer.

Second, Plaintiffs propose the rule that officers may not shoot a suspect who is too far away to be an imminent threat. (Docket Entry 65, at 13–14.) Plaintiffs cite *Lytle* to support this rule, but as noted above the facts in *Lytle* differ significantly from those here. The other case upon which Plaintiffs rely, *Amador*, likewise presents substantially different facts. *See Amador*, 961 F.3d at 726 (denying qualified immunity where officer shot suspect who was "standing nearly [30] feet [away], . . . motionless, and with his hands in the air for several seconds").[16] In this case, the BWCs show that Perez was clearly close enough to be a threat and was rapidly moving closer when the shots were fired.

Finally, Plaintiffs propose that a police officer may not use lethal force in lieu of non-lethal options or retreat. (Docket Entry 65, at 14.) The only case Plaintiffs cite for this rule is inapposite, and fails to establish the rule Plaintiffs propose. *See Crane v. City of Arlington, Tex.*, 50 F.4th 453, 467 (5th Cir. 2022) (holding that officers may not "use deadly force on an unarmed man in a parked car"). In any event, the BWCs in this case reveal numerous prior attempts to reason with Perez to avoid any forceful entry into her apartment to apprehend her. (Docket Entry 61-2, at 12:45–13:08; Docket Entry 61-5, at 9:20–10:30, 17:25–45, 20:32–52, 21:20–32.) The BWCs also reveal that the Officer Defendants initially planned to use tasers and other nonlethal means of apprehending Perez before she charged them with the hammer (Docket Entry 61-2, at 17:12–30, 23:21–55; Docket Entry 61-3, at 20:08–26; Docket Entry 61-5, at 16:27–45, 22:37–23:02), and that they had a reasonable basis for believing that entry was urgent, given the combination of Perez's violent and erratic behavior with the presence of a bedridden old man in the apartment with her (Docket Entry 61-2, at 13:35–42; Docket Entry 61-3, at 19:26–36; Docket Entry 61-5, at 15:45–54). And,

---

[16] Plaintiffs also cite two unpublished opinions, but unpublished opinions "cannot be the source of clearly established law for qualified immunity analysis." *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019).

as noted above, the small space in which the encounter occurred made retreat difficult and dangerous.[17] In sum, even if the Court finds that the Officer Defendants violated the Fourth Amendment in using lethal force, Plaintiffs have failed to show that the applicable constitutional rule was "clearly established," so as to overcome the qualified immunity defense.[18]

### C. Monell *Liability for the City.*

A finding that no constitutional violation occurred also resolves the *Monell* claim against the City.[19] "[E]very *Monell* claim requires un underlying constitutional violation." *Hicks-Fields*,

---

[17] *See* n.5, *supra.*

[18] Plaintiffs argue in the alternative that the constitutional violation in this case was so obvious that they are exempt from their burden of demonstrating that the law was clearly established by a similar case. (Docket Entry 65, at 10.) But "[t]he standard for obviousness is sky high," *Joseph on Behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020), and so-called obvious cases are "so rare that the Supreme Court has never identified one in the context of excessive force," *Harmon*, 16 F.4th at 1167. While the Fifth Circuit has applied this rare exception in the excessive-force context, it has done so only in cases with unusually egregious facts. *See, e.g., Cole v. Carson*, 935 F.3d 444, 449 (5th Cir. 2019) (holding that violation was obvious where officers "provided no warning" before fatally shooting suspect who was "unaware of [their] presence, . . . . never pointed a weapon at [them], . . . . never made a threatening or provocative gesture towards [them], . . . . [and] was not [even] facing [them]"). By contrast, the above discussion demonstrates that "this is not the rare obvious case for which no similar case is needed." *Joseph*, 981 F.3d at 337.

[19] Plaintiff disputes the timeliness of the City's motion. (*See* Docket Entry 64, at 1 n.1.) The City has already filed an answer and an amended answer in this case. (Docket Entries 11 and 33.) Normally, this would preclude the City from filing its 12(b)(6) motion. *See* Fed. R. Civ. P. 12(b) ("[A] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."). However, by amending their complaint again, Plaintiffs "opened the door for [the City] to file . . . a 12(b) motion." *Compass Bank v. Vey Fin., LLC*, No. EP-10-CV-137-PRM, 2011 WL 3666608, at *3 (W.D. Tex. Apr. 29, 2011) (citing 5C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1361 (3d. ed. 2004) ("Whenever the court allows a party to amend its pleading, the opposing party's right to interpose a Rule 12(b) motion is extended or revived accordingly.")). In any event, the City would also be entitled to seek dismissal inasmuch as it asserted "fail[ure] to state a claim" as an affirmative defense in each of its answers on file. (Docket Entry 11, at 10; Docket Entry 33, at 10.) *See Delhomme v. Caremark Rx Inc.*, 232 F.R.D. 573, 576 (N.D. Tex. 2005) ("If the defendant has previously included failure to state a claim . . . as an affirmative defense in his or her answer . . . then courts will generally permit a Rule 12(b)(6) motion to be filed after the answer.").

860 F.3d at 808 (citations and internal marks omitted).  Plaintiffs' excessive-force claim against the Officer Defendants is the only constitutional violation alleged in this case.  Accordingly, because the underlying constitutional claim against the Officer Defendants should be dismissed, the Court should also dismiss Plaintiffs' *Monell* claim against the City.  *See Self v. City of Mansfield, Tex.*, 369 F. Supp. 3d 684, 702 (N.D. Tex. 2019) ("Because the court has held there were no underlying constitutional violations, the City cannot be held liable for [plaintiff's] death."); *Wood v. Bexar Cnty., Tex.*, No. SA-21-CV-895-OLG (HJB), 2024 WL 4983660, at *14 (W.D. Tex. Sept. 20, 2024) ("[T]he County is entitled to summary judgment . . . because no false arrest occurred, let alone one caused by the County's policies."), *report and recommendation adopted*, No. SA-21-CV-00895-OLG, 2024 WL 4982997 (W.D. Tex. Dec. 3, 2024); *Brown v. City of Grand Prairie*, No. CIV.A. 3:01-CV-0139-, 2002 WL 171728, at *6 (N.D. Tex. Jan. 29, 2002) ("Having already found that Plaintiff cannot assert a deprivation of his constitutional rights in this case, the Court shall also grant summary judgment to Defendant City.").

## V.    Conclusion and Recommendation.

For the foregoing reasons, I recommend that the Defendants' motions to dismiss (Docket Entries 57 and 61) be **GRANTED**.

## VI.    Notice of Right to Object.

The Clerk of the Court shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Report and Recommendation must be filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties. An objecting party must specifically identify the findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered." *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on May 28, 2025.

Henry J. Bemporad
United States Magistrate Judge